UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

SANDRA BUDANSINGH,                    :

        Plaintiff,                     :

  -against-                          :

                        :    08 Civ. 03356 (RJS) (DF)

BETH ISRAEL MEDICAL CENTER and LOCAL :
1199 SERVICE EMPLOYEES INTERNATIONAL :
UNION,                                :

        Defendants.

------------------------------------- X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

EDWARDS ANGELL PALMER & DODGE LLP
Rory J. McEvoy, Esq.
Jason D. Stuart, Esq.
Attorneys for Defendant
Beth Israel Medical Center
750 Lexington Avenue
New York, New York  10022
212.308.4411

LEVY RATNER, P.C.
Richard Dorn, Esq.
Attorneys for Defendant
1199SEIU United Healthcare Workers East
80 Eighth Avenue Floor 8
New York, New York 10011
212.627.8100

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ iii

PRELIMINARY STATEMENT .............................................................................................. 1

FACTS ...................................................................................................................................... 2

A.  The Methadone Maintenance Treatment Program At Beth Israel Medical Center .................................................................................................................... 2

B.  Local 1199 .......................................................................................................... 4

C.  Cause For Discharge Under The CBA ................................................................ 4

D.  Budansingh's Employment History Prior To Joining The MMTP ..................... 5

E.  Budansingh's Employment At The MMTP .......................................................... 6

F.  Budansingh Transfers To Clinic 8D In October 2004 ........................................ 6

G.  The MMTP Issues Budansingh A Final Warning In Lieu Of Suspension ........... 7

H.  In December 2005, A Patient Complains That Plaintiff Yelled At And Humiliated Her .................................................................................................... 9

I.  In April 2006, Plaintiff Threatens The Clinic Manager ..................................... 9

J.  In April 2006, Co-Workers Complain Again About Plaintiff ............................ 11

K.  In May 2006, Patient J.C. Complained About Plaintiff ..................................... 11

L.  In October 2006, Budansingh Intimidates And Threatens Patient J.C. For Making His Complaint Against Her .................................................................. 12

M.  The MMTP Terminates Budansingh's Employment ........................................... 15

N.  The Union Files A Grievance About Plaintiff's Discharge ............................... 15

O.  Budansingh Brings The Instant Lawsuit Against BIMC And The Union ........... 18

ARGUMENT ........................................................................................................................... 19

SUMMARY JUDGMENT SHOULD BE GRANTED TO DEFENDANTS BECAUSE
PLAINTIFF CANNOT SHOW THAT THE UNION BREACHED ITS DUTY OF FAIR
REPRESENTATION OR THAT THE HOSPITAL BREACHED THE CBA ........................ 19

A.  Applicable Legal Standards .............................................................................. 19

1.  The Summary Judgment Standard ......................................................... 19

2.  Standards for the DFR and the Hybrid §301/DFR Claim ...................... 21

B.  The Union Did Not Act Unreasonably, Arbitrarily, In Bad Faith Or With Discriminatory Intent. ...................................................................................... 23

C.  Alternatively, Summary Judgment Is Appropriate Because There Was No Causal Connection Between The Union's Conduct And Budansingh's Termination ........................................................................................................ 28

**TABLE OF CONTENTS**
(continued)

**Page**

D.    Even If Plaintiff Could Establish A Genuine Issue Of Material Fact On
Her DFR Claim, She Cannot Show That BIMC Breached The CBA ................ 29

    1.    Standards For A Breach Of CBA Claim ................................................. 29

    2.    BIMC Did Not Violate The CBA ......................................................... 30

CONCLUSION ................................................................................................................ 33

# TABLE OF AUTHORITIES

Page(s)

CASES

*Acheson v. Falstaff Brewing Corp.,*
    523 F.2d 1327 (9th Cir. 1975) ............................................................................... 29-30

*Adickes v. S.H. Kress & Co.,*
    398 U.S. 144 (1970) ............................................................................................... 19

*Airline Pilots Ass'n Int'l v. O'Neill,*
    499 U.S. 65 (1991) ............................................................................................... 23, 24

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ............................................................................................... 19, 20

*Barr v. United Parcel Serv.,*
    868 F.2d 36 (2d Cir. 1989)............................................................................... 21, 26, 27

*Blossomgame v. United Presbyterian Residence,*
    No. 02-1594, 2004 U.S. Dist. LEXIS 18246 (E.D.N.Y. Sept. 10, 2004) ............................... 29

*Burkevich v. Airline Pilots Assoc. Int'l,*
    894 F.2d 346 (9th Cir. 1990) ............................................................................... 28

*Capobianco v. Brink's, Inc.,*
    543 F.Supp. 971 (E.D.N.Y. 1982), *aff'd mem.*, 722 F.2d 727 (2d Cir. 1983) ......................... 27

*Carrion v. Enter. Ass'n, Metal Trades Branch Local Union 638,*
    227 F.3d 29 (2d Cir. 2000)............................................................................... 21

*Chambers v. TRM Copy Ctrs. Corp.,*
    43 F.3d 29 (2d Cir. 1994)............................................................................... 19

*Considine v. Newspaper Agency Corp.,*
    43 F.3d 1349 (10th Cir. 1994) ............................................................................... 23

*Cook v. Pan Am. World Airways, Inc.,*
    771 F.2d 635 (2d Cir. 1985)............................................................................... 27

*Cruz v. Local Union No. 3 of IBEW,*
    34 F.3d 1148 (2d Cir. 1994)............................................................................... 28

*Del Costello v. Int'l Bhd. of Teamsters,*
    462 U.S. 151 (1983)............................................................................... 21

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Dutrisac v. Caterpillar Tractor Co.*,
749 F.2d 1270 (9th Cir. 1983) ....................................................................................27

*Farkas v. Ellis*,
780 F. Supp. 1013 (S.D.N.Y. 1992)............................................................................22

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993)....................................................................................................24

*Ford Motor Co. v. Huffman*,
345 U.S. 330 (1953).....................................................................................................24

*Gallo v. Prudential Residential Servs., Ltd. P'ship.*,
22 F.3d 1219, 1223 (2d Cir. 1994)..............................................................................19

*Goenaga v. March of Dimes Birth Defects Found.*,
51 F.3d 14 (2d Cir. 1995).....................................................................................19, 20

*H. R. Co. v. Conrail*,
902 F.2d 174,178 (2d Cir. 1990).................................................................................20

*Hotel Greystone Corp. v. New York Hotel and Motel Trades Council, AFL-CIO*,
902 F. Supp. 482 (S.D.N.Y. 1995) .............................................................................29

*Johnson v. Soft Drink Workers Union, Local 812*,
568 F. Supp. 1203 (S.D.N.Y. 1983)............................................................................29

*Jordan v. Viacom Outdoor Group*,
475 F. Supp. 2d 440 (S.D.N.Y. 2007)....................................................................22, 32

*Knight v. U.S. Fire Ins. Co.*,
804 F.2d 9 (2d Cir. 1986)............................................................................................20

*Lalley v. Bethlehem Steel Corp.*,
703 F. Supp. 1047 (W.D.N.Y. 1989) ..........................................................................30

*Lang v. Ret. Living Pub. Co.*,
949 F.2d 576 (2d Cir. 1991)........................................................................................19

*Lavigna v. Capital Cities*,
No. 96 Civ. 7734, 2000 WL 1772792 (S.D.N.Y. Nov. 30, 2000) ...........................23

*Mack v. Otis Elevator Co.*,
326 F.3d 116 (2d Cir. 2003)........................................................................................21

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Marquez v. Screen Actors Guild, Inc.*,
    525 U.S. 33 (1998)................................................................................................25

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..............................................................................................19

*McCarthy v. Dun & Bradstreet Corp.*,
    482 F.3d 184 (2d Cir. 2007)..................................................................................20

*Miller v. U.S. Postal Serv.*,
    985 F.2d 9 (1st Cir. 1993)......................................................................................27

*Palancia v. Roosevelt Raceway, Inc.*,
    551 F. Supp. 549 (E.D.N.Y. 1982) ......................................................................29

*Peterson v. Kennedy*,
    771 F.2d 1244 (9th Cir. 1985) ..............................................................................27

*Rakestraw v. United Airlines, Inc.*,
    981 F.2d 1524 (7th Cir. 1992) ..............................................................................24

*Shider v. New York Telephone Co.*,
    2004 U.S. Dist. LEXIS 5068 (S.D.N.Y. Mar. 29, 2004), *aff'd*, No. 04-2616, 2005
    U.S. Dist. LEXIS 2231 (2d Cir. Oct. 17, 2005).....................................................28

*Spellacy v. Airline Pilots Ass'n-Int'l*,
    156 F.3d 120 (2d Cir. 1998)..........................................................................21, 23

*Tomney v. Int'l Ctr. for the Disabled*,
    357 F.Supp.2d 721 (S.D.N.Y. 2005)....................................................................21

*Vaca v. Sipes*,
    386 U.S. 171 (1967)....................................................................22, 23, 24, 27

*Van Lawrence v. The Schubert Org., Inc.*,
    No. 94 Civ. 2591, 1996 U.S. Dist. LEXIS 2903 (S.D.N.Y. Mar. 12, 1996)..................... 19-20

*Western World Ins. Co. v. Stack Oil, Inc.*,
    922 F.2d 118 (2d Cir. 1990)..................................................................................20

*White v. White Rose Food*,
    237 F.3d 174 (2d Cir. 2001)..........................................................................21, 22

*Wilder v. GL Bus Lines*,
    258 F.3d 126 (2d Cir. 2001)..................................................................................21

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Young v. U.S.P.S.,*
 907 F.2d 305 (2d Cir. 1990)..........................................................................................22

**STATUTES**

29 U.S.C. § 185(a) ........................................................................................................18

Labor Management Relations Act Section 301(a).....................................18, 21, 22, 30

**OTHER AUTHORITIES**

Federal Rules of Civil Procedure 56(c) ........................................................................19

Federal Rules of Civil Procedure 56(e) ........................................................................20

## PRELIMINARY STATEMENT

This action involves claims against 1199SEIU United Healthcare Workers East ("1199" or "Union") (named above as "Local 1199 Service Employees International Union") and Beth Israel Medical Center ("BIMC" or the "Hospital") by a member of the Union who was employed as a substance abuse counselor in the Methadone Maintenance Treatment Center ("MMTP") of the Hospital. Plaintiff Sandra Budansingh ("Plaintiff" or "Budansingh") alleges that the Union violated its duty of fair representation ("DFR") by refusing to demand arbitration in connection with her termination from employment for unethical and unprofessional behavior. Budansingh also alleges that she was wrongfully terminated from employment by the Hospital. Specifically, Budansingh takes issue with the Union's decision that her case did not merit filing for arbitration.

As discussed below, the DFR does not require a Union to file a demand for arbitration in all cases. In fact, a Union is given wide discretion to decide whether to proceed to arbitration in an individual case. If the Union does not believe that there is a reasonable likelihood of success on the merits, then the Union is not required to arbitrate a dispute. A plaintiff who challenges a Union's exercise of its discretion has a heavy burden of proof. It must be shown that the Union's actions were arbitrary, discriminatory or in bad faith. Absent such evidence, the Union will not be held liable for its decision not to arbitrate a particular claim.

The Union represented Budansingh fairly throughout the grievance process, thoroughly investigated her claims and properly exercised its discretion not to pursue her case to arbitration. Budansingh was then given the opportunity to appeal the Union's decision through the hearing and appeals process established under the Constitution of the Union. Thus, she will not be able to meet her burden of proof against the Union.

Finally, Budansingh cannot sustain her claim because she cannot demonstrate that BIMC wrongfully terminated her employment. The Hospital terminated Plaintiff's employment based upon the signed written statements of five of its employees who met with a patient who complained that Budansingh breached the patient's confidentiality by confronting him outside of the clinic regarding a previous complaint that he had made and that she engaged in threatening and intimidating conduct towards the patient regarding that complaint. The Hospital's policies expressly prohibit the type of behavior that Budansigh engaged in. Further, the Hospital acted reasonably in crediting the patient's account because Budansingh's conduct toward this patient was fully consistent with her substantial prior history of similar behavior and there can be no serious doubt that threatening a patient and breaching a patient's confidentiality is cause for discharge. Accordingly, Budansingh cannot meet her burden of proof against BIMC.

## FACTS

A. **The Methadone Maintenance Treatment Program At Beth Israel Medical Center**

BIMC is a full-service tertiary teaching hospital with divisions throughout New York City and Brooklyn. (Sand. Decl. ¶ 2).[1] BIMC is a member of Continuum Health Partners, Inc. ("Continuum"), a nonprofit hospital system in New York City comprised of five historically distinguished hospitals offering a full range of primary care and specialty treatments. (Sand. Decl. ¶ 2). BIMC operates a Methadone Maintenance Treatment Program (the "MMTP") consisting of 18 methadone maintenance treatment clinics that together serve over 6,000 opioid

---

[1] The Affidavits of Alexander Jackson, referred to as ("Jack. Aff."), Arlann Walker, referred to as ("Walk. Aff."), Anna Ortiz, referred to as ("Ortiz Aff."), and Ronnie Babb, referred to as ("Babb Aff."), as well as the Declarations of Calvin Grant, referred to as ("Grant Decl."), and Glorice Sanders, referred to as ("Sanders Decl."), are also submitted in support of this motion. Relevant exhibits are also attached to the Declaration of Richard Dorn ("Dorn Decl."). Excerpts from the transcripts of BIMC's deposition of Plaintiff, referred to as ("Pl. Tr."), and the Union's deposition of Plaintiff, referred to as ("Pl. Union Tr."), are attached as Exhibits 2 and 3 to the Declaration of Rory J. McEvoy ("McEvoy Decl."), which is annexed to BIMC's Notice of Motion. Exhibits from BIMC's deposition of Budansingh are attached to the McEvoy Decl. and referred to as "Hosp. Ex."

2

addicted patients. (Sand. Decl. ¶ 2). BIMC's network of clinics is the oldest and largest

methadone maintenance treatment system in the country. (Sand. Decl. ¶ 2).

Patients at the MMTP are treated by substance abuse counselors, whose duties include

patient intake, developing individualized treatment plans for patients in consultation with the

MMTP's nurses and physicians, documenting treatment progress, and providing referral services

for patients. (Sand. Decl. ¶ 4). As part of the patient intake process, a substance abuse counselor

reviews the Patient's Bill of Rights with each patient, which guarantees the patient the right to,

among other things: (i) "complain without fear of reprisals about the care and services you are

receiving and to have the hospital respond to you . . ."; and (ii) the right to "privacy while in the

hospital and confidentiality of all information and records regarding your care." (Sand. Decl. ¶

5, Ex. 1; Pl. Tr. 113-18, 130-39).

The MMTP requires its substance abuse counselors to follow the New York state and

federal statutes and regulations governing the protection of confidential patient information,

which, as set forth in the MMTP's policy on the Confidentiality of MMTP Patient Records and

HIV Related Information, strictly prohibits the disclosure of the identity or information of

individuals enrolled in a drug treatment program without their written consent. (Sand. Decl. ¶ 6,

Ex. 2; Pl. Tr. 38-45, 120-30, 140-41). In order to prevent the disclosure of the identity of

enrollees, the MMTP requires that counselors refrain from interacting with patients outside of the

clinic so that the public does not identify them as a patient of the clinic. (Sand. Decl. ¶ 6; Pl. Tr.

140-41). As a substance abuse counselor, Budansingh received training with regard to patient

confidentiality and was aware that a breach of confidentiality would be a violation of the Health

Insurance Portability and Accountability Act ("HIPAA") law. (Pl. Tr. 30-31, 35, 37-38, 43- 44).

Each clinic at the MMTP has its own Clinic Manager. The Clinic Manager is responsible for the overall management of the respective clinic's daily operations including, among other things, the staff's compliance with applicable MMTP and BIMC policies and procedures, the security and safety of patients and staff, the confidentiality of patient records, and the supervision and evaluation of the substance abuse counselors. (Sand. Decl. ¶ 3).

**B.    Local 1199**

All substance abuse counselors at the MMTP are members of 1199. The Union represents voluntary hospital workers at BIMC and other institutions located throughout New York City. (Sand. Decl. ¶ 7). BIMC and the Union are parties to a collective bargaining agreement ("CBA"), which governs the terms and conditions of the counselors' employment. (Sand. Decl. ¶ 7, Ex. 3).

The CBA provides the MMTP with "the right to discharge, suspend or discipline any Employee for cause." (Sand. Decl. ¶ 7, Ex. 3; Pl. Tr. 144-47). The CBA further provides that any employee wishing to contest a discharge or suspension can file a grievance. (Sand. Decl. ¶ 7, Ex. 3 at 87). Any grievance filed relating to a discharge or suspension automatically advances to the third and final step in the grievance procedure, which consists of a hearing and the issuance of a written decision. (Sand. Decl. ¶ 7, Ex. 3 at 87-89). Under the CBA, the Union or the MMTP can appeal the decision to an independent arbitrator. (Sand. Decl. ¶ 7, Ex. 3 at 93).

**C.    Cause For Discharge Under The CBA**

BIMC's employee handbook, a copy of which Plaintiff received, sets forth the employee misconduct that constitutes a "serious violation" of BIMC's policies and procedure sufficient to provide cause for immediate discharge under the CBA. (Sand. Decl. ¶ 8, Ex. 4; Pl. Tr. 101-06, 146). The prohibited conduct includes "[t]hreatening, intimidating, coercing or fighting with an

employee, patient or visitor, by word or action." (Sand. Decl. ¶ 8, Ex. 4; Pl. Tr. 105). The handbook further states that "[t]he improper or unauthorized use or disclosure of confidential information" provides sufficient cause for discharge. (Sand. Decl. ¶ 8, Ex. 4; Pl. Tr. 110-11, 146).

Continuum's Code of Conduct additionally states that sufficient cause for discharge exists for any employee who "engages in unauthorized or unlawful disclosure of information in violation of the privacy rights of our patients," including an employee who fails to "[e]nsure compliance to the special confidentiality rules that apply to patients in drug and alcohol treatment programs, as well as disclosure of information regarding a patient's HIV status." (Sand. Decl. ¶ 9, Ex. 5, Pl. Tr. 121-22). Budansingh understood that she was not to discuss patient issues with anyone outside the MMTP. (Pl. Tr. 127-28).

**D.** **Budansingh's Employment History Prior To Joining The MMTP**

From 1993 through 1999, Budansingh worked as a substance abuse counselor at the Albert Einstein College of Medicine ("AECOM"). (Pl. Tr. 51, 100). While at AECOM, Budansingh was a member of 1199. (Pl. Tr. 100). In 1999, AECOM allowed Budansingh to resign her employment in lieu of termination, after a patient in a group led by Budansingh complained that she intimidated the patient. (Pl. Tr. 62-64). Less than 24 hours later, however, Budansingh rescinded her resignation and AECOM terminated her employment. (Pl. Tr. 68-71). After 1199 determined not to grieve her termination, Budansingh filed a complaint with the National Labor Relations Board ("NLRB") accusing 1199 of breaching its DFR. (Pl. Tr. 95-97). The NLRB dismissed Budansingh's claim. (Pl. Tr. 95-97).

E.    **Budansingh's Employment At The MMTP**

In November 1999, Budansingh began her employment as a substance abuse counselor at

Clinic 6/7 of the MMTP.  (Pl. Tr. 155, 193, Hosp. Ex. J).  Within six months of the start of her

employment, in April 2000, Budansingh received a one-day suspension after she slammed a

patient's chart on her Clinic Manager's desk, told him that he "behave[s] like Hitler," berated

him in a loud voice and stormed out of his office.  (Pl. Tr. 148-55, Hosp. Exs. I, J).  In

accordance with the grievance procedure set forth in the CBA, the Union filed a grievance on

Budansingh's behalf, which was denied in a written decision after a third step hearing.  (Pl. Tr.

148-55, Hosp. Ex. J).

After continuing difficulties with the Clinic Manager, Budansingh requested a transfer to

a new clinic.  (Pl. Tr. 194).  The MMTP granted her request, transferring her to Clinic 3, situated

on a different floor than Clinic 6/7, where Budansingh would have a different Clinic Manager

and different coworkers.  (Pl. Tr. 194-95).  At her new clinic Budansingh had difficulty

interacting with her coworkers and requested another transfer.  (Pl. Tr. 195-97).  The MMTP

again granted her request, transferring her to Clinic 8D, located in a different building than

Clinic 3, with a different Clinic Manager and different coworkers.  (Pl. Tr. 196-97).

F.    **Budansingh Transfers To Clinic 8D In October 2004**

In October 2004, Budansingh transferred to Clinic 8D.  (Pl. Tr. 196-97).  Budansingh

looked forward to working in Clinic 8D because she felt that she would have a better relationship

with the Clinic Manager, Alexander Jackson, since they both came from the Caribbean.  (Jack.

Aff. ¶ 3; Pl. Tr. 198).  Despite the transfer, Budansingh's interpersonal problems continued.

From October 2004 through January 2005, counselors, nursing staff and patients told Jackson

that Budansingh:  berated a patient; accused another patient of faking psychiatric issues; refused

to work with a patient who spoke with a Spanish accent; refused to speak with a co-worker due

to a disagreement; told a patient that a counselor disliked him; humiliated a patient regarding his

urine sample in front of the staff and patients; embarrassed a patient for being late in front of the

staff and patients; and loudly stated patients' personal business in the open area of the clinic.  In

addition, three of Budansingh's patients requested a new counselor.  (Jack. Aff. ¶ 3, Ex. 1).

Jackson counseled Budansingh about each of the incidents, reminding her of the need to

maintain professionalism in the workplace, respect patients' rights, and communicate more

effectively with patients and coworkers.  (Jack. Aff. ¶ 3).

Despite Jackson's efforts to counsel Budansingh, her interpersonal problems continued.

In Budansingh's 2005 review, Jackson commented that she "becomes too emotionally involved

with individual patient treatment issues and this interferes with treatment" and "needs to work on

her social skills as to better interact with her co-workers and treatment team."  (Jack. Aff. ¶ 8,

Ex. 4).  Budansingh refused to accept Jackson's appraisal, however, and wrote a rebuttal blaming

her co-workers for her problems, claiming that "the problems have been instigated by certain co-

workers, and have not been initiated by me."  (Jack. Aff. ¶ 8, Ex. 4; Pl. Tr. 176-81).

G.     **The MMTP Issues Budansingh A Final Warning In Lieu Of Suspension**

Budansingh's problems interacting with patients and co-workers escalated in June 2005.

On June 21, 2005, a Clinic 8D security guard, who worked for an outside contractor that

supplied security guards to the Clinic, brought one of Budansingh's former patients to her, who

had arrived from another clinic to seek courtesy treatment, but Budansingh refused to assist the

patient.  (Jack. Aff. ¶ 4).  The following day, the same security guard brought one of

Budansingh's current patients to see her, but she refused to assist that patient as well.  (Jack. Aff.

¶ 4).  After interviewing the security guard, and a secretary who had witnessed the incident on

7

the second day, Jackson met with Budansingh, who denied that the events had occurred as described and blamed the security guard and patients. (Jack. Aff. ¶ 4).

Over the next several days, Plaintiff made six unauthorized calls to the security guard's employer in an attempt to get the security guard removed. She also made phone calls to the secretary, threatening to write the secretary up and telling the secretary that she was "acting like those Niggers!" (Jack. Aff. ¶ 4). On July 7, 2005, acting at the direction of the MMTP administration, Jackson issued Plaintiff a final warning in lieu of a one day suspension for her behavior associated with these incidents. (Jack. Aff. ¶ 5, Ex. 2). Plaintiff understood this final warning was equivalent to a suspension for purposes of progressive discipline, and was therefore, the last step before termination in the progressive discipline process. (Pl. Tr. 158).

Shortly thereafter, on July 14, 2005, Plaintiff's coworkers submitted a signed petition to Jackson and the MMTP administration complaining about Plaintiff's "relentless unprofessional and destructive behavior." (Jack. Aff. ¶ 6, Ex. 3). Plaintiff's coworkers stated that they were "all grateful when she is not here on any given day because she is incredibly disruptive when she is here." (Jack. Aff. ¶ 6, Ex. 3). They requested that Plaintiff "be relocated from Clinic 8D as her erratic, abusive, racist and unprofessional behavior seems to be escalating rather than dissipating." (Jack. Aff. ¶ 6, Ex. 3).

In accordance with the CBA, the Union grieved Plaintiff's final warning on her behalf. (Jack. Aff. ¶ 7; Pl. Tr. 166-68, Hosp. Ex. L). After a third step grievance hearing, the hearing officer upheld the final warning, concluding that the credible evidence established that Plaintiff acted in a "very unprofessional" manner by refusing to help patients, making unauthorized telephone calls to complain about the security guard's behavior, and threatening the secretary over the telephone. (Pl. Tr. 166-68, Hosp. Ex. L).

**H.    In December 2005, A Patient Complains**
**That Plaintiff Yelled At And Humiliated Her**

After her discipline, Budansingh continued to have difficulties interacting with patients, her coworkers and her supervisor. For example, on December 19, 2005, a patient complained that when he went to Budansingh office for his appointment Budansingh yelled loudly at him, "Can't you see I am busy with a patient? You have to wait!" (Jack. Aff. ¶ 10). The patient felt humiliated by the incident and requested a new counselor. (Jack. Aff. ¶ 10). When Jackson counseled Budansingh, she denied yelling at the patient and claimed that the patient "misinterpreted" her actions. (Jack. Aff. ¶ 10, Ex. 6).

In her 2006 review, Jackson noted that Budansingh "does not meet" expectations in two important rating categories: (1) "her ability to demonstrate a professional, courteous, and respectful attitude in dealing with patients, families and significant others"; and (2) "her ability to display courtesy, tact and patience during interactions with all members of the hospital staff and extended community." (Jack. Aff. ¶ 9, Ex. 5). Jackson also noted that Budansingh had "not fully demonstrated consistency with regards to her working relationship with staff and patients" and that she "is encouraged to be more patient friendly and sensitive to patient needs." (Jack. Aff. ¶ 9, Ex. 5). Jackson recommended that Budansingh "attend specialized training through Human Resources that will help her in the areas of patient and staff communication," but Budansingh never did so during the remainder of her employment at the MMTP. (Jack. Aff. ¶ 9, Ex. 5; Pl. Tr. 191-93).

**I.    In April 2006, Plaintiff Threatens The Clinic Manager**

On April 8, 2006, Jackson instructed the counselors that the security guards who typically screen the incoming patients would be arriving late and that the counselors should cover the clinic floor because Jackson would be stationed at the entrance to the clinic building to screen the

patients as they arrived. (Jack. Aff. ¶ 11). While Jackson was away from the clinic floor, one of

Budansingh's patients attempted to make a payment to her, but Budansingh refused to take the

payment and told the patient to find Jackson. Jackson told Budansingh that she should have

collected the payment because they were shorthanded, but Budansingh disagreed, telling him that

her job did not include collecting payments. (Jack. Aff. ¶ 11). After Jackson told Budansingh

that he would contact the MMTP administration for clarification of the MMTP policy regarding

the collection of payments, she became confrontational, threatening to get him fired and sue him

if he wrote her up. (Jack. Aff. ¶ 11, Ex. 7).

Because of Budansingh's ongoing problems in Clinic 8D, and in light of the April 8

incident, Millie Gonzalez-Haig, Assistant Director of Program and Staff Development, met with

Budansingh and a Union delegate on April 13, 2006. (Sand. Decl. ¶ 11; Pl. Tr. 225). Gonzalez-

Haig counseled Budansingh on the "perceptions of others towards [her] behavior when [she gets]

upset," her "pattern of behavior whereby [she] is unable to be a team player," her "ability to

draw other staff into [her] conflict with specific staff members and disrupt the operation of [her]

clinic site," and her "pattern of not accepting responsibility for the role [she has] played in

specific situations." (Sand. Decl. ¶ 12, Ex. 6). Budansingh agreed to modify her behavior,

including using "mechanisms that will prevent [her] from losing [her] temper and getting

emotional in an inappropriate and disruptive manner," making "every effort to get along with

[her] colleagues," and making "every effort to cease blaming others for [her] behaviors." (Sand.

Decl. ¶ 12, Ex. 6). Gonzalez-Haig warned Budansingh that "any further incident of disruptive

and inappropriate behavior will result in progressive disciplinary action up to [and] including

termination of employment." (Sand. Decl. ¶ 12, Ex. 6). Several days later, Gonzalez-Haig

provided Budansingh with a memorandum outlining the content of the meeting.  (Sand. Decl. ¶ 12, Ex. 6; Pl. Tr. 240).

**J.    In April 2006, Co-Workers Complain Again About Plaintiff**

On April 25, 2006, the Clinic 8D staff submitted a memorandum to the MMTP administration complaining that Budansingh "continues to be a disruptive influence in our otherwise peaceful clinic."  (Sand. Decl. ¶ 13, Ex. 7).  Specifically, the staff complained that Budansingh "makes racist remarks," "screams and yells at both patients and staff," "is blatantly disrespectful to the Clinic Manager," "has attempted to pit staff against staff and to manipulate patients in an entirely corrupt and inappropriate manner," and "is an overall hostile and negative influence in the clinic."  The staff requested that the administration "intercede on [their] behalf." (Sand. Decl. ¶ 13, Ex. 7).

**K.    In May 2006, Patient J.C. Complained About Plaintiff**

On May 15, 2006, a patient named J.C. approached Jackson regarding his request to receive take-home medication because of an upcoming vacation on the date of his regular appointment.  (Jack. Aff. ¶ 12).  Because J.C.'s primary and backup counselors were not present that day, Jackson asked Budansingh to handle J.C.'s request.  Budansingh begrudgingly agreed to assist J.C.  Shortly after Jackson assigned J.C.'s request to Budansingh, J.C. returned complaining that Budansingh treated him in a disrespectful manner, snatched his identification card from his hand and complained about having to assist him.  (Jack. Aff. ¶ 12).  Jackson brought the complaint to Gonzalez-Haig's attention, who advised Jackson to ask the patient to submit a written complaint.  (Jack. Aff. ¶¶ 12-13, Exs. 8, 9).  The patient agreed to do so, and on June 4, 2006, J.C. submitted a written statement detailing how Budansingh "harassed" him as to why he wanted the medication, pulled his identification card from him "roughly" and told that him she "didn't care" if he got medication.  (Sand. Decl. ¶ 15, Ex. 9; Jack. Aff. ¶ 14, Ex. 10).

J.C. requested the MMTP administration's "intervention." (Sand. Decl. ¶ 15, Ex. 9; Jack. Aff. ¶ 14, Ex. 10).

The MMTP administrators scheduled a meeting with Budansingh to address J.C.'s complaint. On June 13, 2006, Glorice Sanders, Associate Director of Operations, and Patti Juliana, Administrative Director of the MMTP, met with Budansingh and her union delegate. (Sand. Decl. ¶ 16). The MMTP administrators counseled Budansingh on her inappropriate response to J.C.'s request and how she could have responded in an appropriate fashion. (Sand. Decl. ¶ 16). They reviewed the issues previously discussed and the agreements reached with Budansingh at the April 13, 2006 meeting. (Sand. Decl. ¶ 16). The MMTP administrators again warned Budansingh that "further incidents of disruptive and inappropriate behavior to staff or patients . . . will result in progressive disciplinary action up to and including termination of employment." (Sand. Decl. ¶ 16, Ex. 10). Two days later, Juliana provided Budansingh with a memorandum outlining the content of the meeting. (Sand. Decl. ¶ 16, Ex. 10). Despite the Hospital's warnings, Budansingh did not change the way she dealt with patients or supervisors after the meeting. (Pl. Tr. 267-68).

**L.      In October 2006, Budansingh Intimidates And Threatens Patient J.C. For Making His Complaint Against Her**

On the morning of October 26, 2006, Michelle Mosley, who served as patient J.C.'s primary counselor, observed J.C. leaving Budansingh's office and asked him why he had been in Budansingh's office with the door closed, because she knew that Budansingh was not his counselor. (Jack. Aff. ¶ 16). J.C. stated that Budansingh had invited him into the office to ask him about the complaint letter that he had previously written to the MMTP administration and whether he had been "coerced into writing the letter." (Jack. Aff. ¶ 16). The patient appeared visibly upset and agitated while describing the incident and expressed a fear of retaliation. (Jack.

Aff. ¶ 16).  Mosley advised Jackson of patient J.C.'s complaint, and Jackson contacted Sanders to seek advice as to how to handle the matter.  (Sand. Decl. ¶ 17; Jack. Aff. ¶ 16).  Sanders requested that Mosley prepare a written statement, which Mosley submitted later that day. (Sand. Decl. ¶ 17, Ex. 11; Jack. Aff. ¶ 16, Ex. 11).  On the following day, Friday, October 27, Sanders advised Jackson to meet with patient J.C. to learn more about the incident and see if he wanted to put his complaint in writing.  (Sand. Decl. ¶ 18; Jack. Aff. ¶ 17).

Because J.C. had already left the clinic that morning, Jackson contacted Arlann Walker, the Supervisor of Vocational Services, who would be covering Clinic 8D on Saturday, October 28, and requested that she speak with patient J.C. to learn if he wanted to meet with Jackson on Monday.  (Walk. Aff. ¶ 3; Jack. Aff. ¶ 17).  Walker met with patient J.C. on Saturday, who advised her that he wanted to speak with Jackson on Monday about the situation.  (Walk. Aff. ¶ 5).  The patient also told Walker that Budansingh tried to intimidate him by telling him that her husband wanted to meet with him because both her husband and the patient were of Italian descent.  (Walk. Aff. ¶ 4).  Walker prepared a signed memorandum describing her meeting with patient J.C. and submitted the memorandum to Sanders on October 31, 2006.  (Walk. Aff. ¶ 6, Ex. 1; Sand. Decl. ¶ 18, Ex. 12).

On Monday, October 30, Jackson and Calvin Grant, the assistant supervisor, met with J.C. who told them that Budansingh first confronted him outside of the Clinic 8D building several weeks prior to the October 26 incident and told him that his complaint letter "could result in getting her fired."  (Jack. Aff. ¶ 18; Grant Decl. ¶ 2).  He further stated that he felt that by approaching him outside of the Clinic to discuss issues relating to his conduct as a patient in the Clinic, Budansingh had breached his confidentiality.  (Jack. Aff. ¶ 18; Grant Decl. ¶ 2).  J.C. told Jackson and Grant that Budansingh "invited him into her office" on October 26 and said that

13

"she wanted him to meet with her husband since they were both of Italian descent." She said they could speak "one paisan to another paisan." (Jack. Aff. ¶ 18; Grant Decl. ¶ 2). J.C. also feared that Budansingh would breach his confidentiality by disclosing his status as a patient to her husband. (Jack. Aff. ¶ 18; Grant Decl. ¶ 2). At Sanders' request, Grant and Jackson prepared a memorandum summarizing their meeting with J.C. (Jack. Aff. ¶ 18, Ex. 12; Grant Decl. ¶ 2, Ex. 1).

    Jackson and Grant also asked J.C. if he wanted to prepare a written statement and he agreed to do so. (Jack. Aff. ¶ 19). Instead of submitting a written statement, however, on October 31, 2006, J.C. made an oral statement to Peter Vanderkloot, a patient advocate. (Sand. Decl. ¶ 20). J.C. told Vanderkloot that Budansingh approached him at the Clinic entrance and told him that she suspected that other staff at Clinic 8D had "used" him to file a complaint against her because they resented Budansingh because she was married to an Italian man. (Sand. Decl. ¶ 20, Ex. 14). J.C. said that Budansingh later brought him into her office and told him that both she and her husband had been upset with his previous complaint and that her husband had wanted to speak with him "paisan to paisan." (Sand. Decl. ¶ 20, Ex. 14). J.C. told Vanderkloot that he interpreted Budansingh's statement as a threat and did not feel comfortable knowing that the counselor had access to his chart and home address. On October 31, Vanderkloot submitted a signed email to Sanders summarizing J.C.'s oral statement. (Sand. Decl. ¶ 20, Ex. 14). After receiving the email, Sanders instructed Jackson to refrain from making any further attempts to obtain a written statement from J.C., to avoid any possibility that J.C. might feel intimidated or coerced. (Sand. Decl. ¶ 21; Jack. Aff. ¶ 19).

**M.**    **The MMTP Terminates Budansingh's Employment**

On November 1, 2006, Sanders and Kathryn Williams, who had replaced Gonzalez-Haig as Assistant Director, met with Budansingh, Jackson and Cecilio Simons, a union delegate. (Sand. Decl. ¶ 22; Jack. Aff. ¶ 20). Sanders and Williams told Budansingh about the complaints that J.C. had made to Mosley, Walker, Jackson, Grant and Vanderkloot, and asked for Budansingh's side of the story. (Sand. Decl. ¶ 22; Jack. Aff. ¶ 21). Budansingh denied that the events occurred as J.C. described them and instead told Sanders and Williams that J.C. came to her office to apologize for making a complaint against her in June 2006, telling her that he did so because Mosley and Jackson offered him favorable treatment. (Sand. Decl. ¶ 22). Sanders and Williams then left the room and spoke with Juliana and Marie Marciano, Administrator of the MMTP, to consider Budansingh's explanation. (Sand. Decl. ¶ 22). Because Budansingh's explanation did not provide any basis for discrediting J.C.'s complaint, which he confirmed to a number of people, but instead fell into Budansingh's usual pattern of blaming others for her actions, Sanders and Williams decided to discharge Plaintiff. (Sand. Decl. ¶ 22, Ex. 15; Jack. Aff. ¶ 21, Ex. 13).

**N.**    **The Union Files A Grievance About Plaintiff's Discharge**

In accordance with the CBA, the Union filed a timely grievance on Budansingh's behalf, and represented Budansingh at a third step hearing on December 12, 2006. On or about November 16, 2006, 1199 Contract Administrator Robin Slater, Union Delegate Nelson Tuitt and 1199 Contract Administrator Anna Evet Ortiz met with the Budansingh to prepare for her third step hearing, (Ortiz Aff. ¶ 7). Budansingh was informed that she should bring all relevant documents to this meeting. (Ortiz Aff. ¶ 7; Dorn Decl. ¶ 7, Ex. 6). At that two (2) hour meeting, Union representatives discussed with Budansingh the details of the allegations against her that resulted in her termination and reviewed her testimony for the third step hearing, as well as her

disciplinary history. (Ortiz Aff. ¶ 10). To that end, the Union representatives reviewed all the documents Budansingh brought with her, including, a disciplinary warning notice Budansingh received on April 14, 2000 regarding a one day suspension for poor conduct (Ortiz Aff. ¶ 8; Dorn Decl. ¶ 2, Ex. 1); a September 1, 2005 third step grievance response regarding Budansingh's final warning in lieu of suspension for poor conduct (Ortiz Aff. ¶ 8; Dorn Decl. ¶ 3, Ex. 2); Budansingh's Position Description/Performance Appraisal dated August 3, 2005 (Ortiz Aff. ¶ 8; Jack. Aff. ¶ 8, Ex. 4); an April 17, 2005 memo from Millie Gonazlez-Haig regarding Budansingh's poor conduct (Ortiz Aff. ¶ 8; Sand. Decl. ¶ 12, Ex. 6); a memo regarding Budansingh's poor behavior from the Staff at Clinic 8D to Alexander Jackson dated July 14, 2005 (Ortiz Aff. ¶ 8; Jack. Aff. ¶ 6, Ex. 3); and a memo regarding Budansingh's problematic behavior from Patti Juliana dated June 15, 2006 (Ortiz Aff. ¶ 8; Sand. Decl. ¶ 16, Ex. 10). Plaintiff also told the Union representatives present at that meeting that she had received a verbal warning in or around July of 2000. (Ortiz Aff. ¶ 9). At Budansingh's request, the Union met a second time to prepare for her third step hearing, and reviewed the same issues that were discussed at the November 16, 2006 meeting. (Ortiz Aff. ¶ 11). Although the Union representatives felt ready to represent Budansingh at the third step hearing, at her request, the Union postponed the hearing in order to meet with the Budansingh on several subsequent occasions to permit more preparation. (Ortiz Aff. ¶ 12).

At the third step hearing, Budansingh was represented by Union representatives Slater, Ortiz and Tuitt. (Ortiz Aff. ¶ 13; Pl. Union Tr. 5). Vanderkloot testified for the Hospital that patient JC communicated to him that Budansingh had discussed the patient with her husband and made threatening statements toward him. Vanderkloot testified further that J.C. said that he was very scared and intimated by her statements. (Ortiz Aff. ¶ 14; Pl. Union Tr. 5-6). Also testifying

for the Hospital was Jackson, who said patient JC told him that the patient had been approached by Budansingh outside of the clinic. (Ortiz Aff. ¶ 14; Pl. Union Tr. 5-6). The Hospital submitted written statements from Jackson and Vanderkloot that were prepared contemporaneously with their interviews with J.C. (Ortiz Aff. ¶ 14). In support of its position that Budansingh was terminated for just cause, the Hospital provided the following additional documents to the hearing officer: the June 4, 2006 letter from patient J.C. complaining about Budansingh's behavior; the April 25, 2006 memo from the Staff of BIMC/MMTP Clinic 8D complaining about Budansingh; and the October 31, 2006 statement from Arlann Walker memorializing her interview with patient J.C. (Ortiz Aff. ¶ 15).

A Union representative argued at the third step hearing that the termination should not be upheld as the April 13 and July 13, 2006 meetings were not disciplinary sessions, and therefore, the Union argued, the Hospital had not followed progressive discipline. (Ortiz Aff. ¶ 16; Pl. Union Tr. 7). At the third step hearing, Budansingh was afforded the opportunity to testify and denied engaging in any misconduct. (Ortiz Aff. ¶ 16; Pl. Tr. 348-49). She was also afforded the opportunity to present any documents in support of her position. (Pl. Tr. 348-349). To that end the Union submitted the following: an August 6, 2004 letter from a patient and a December 7, 2006 letter from a patient in which the patient complained about Budansingh's termination. (Ortiz Aff. ¶ 16; Dorn Decl. ¶¶ 12 ,13, Exs. 11, 12; Pl. Union Tr. 8).

After reviewing evidence and hearing witness testimony offered by the MMTP and the Union, including Budansingh's testimony, the hearing officer upheld her termination. (Sand. Decl. ¶ 23, Ex. 16). The hearing officer viewed Budansingh's testimony as "highly incredible," stating that according to Budansingh "complaints about how she performs her duties are always unwarranted and result from manipulation from Managers or co-workers." (Sand. Decl. ¶ 23,

Ex. 16).  The hearing officer concluded that J.C.'s "complaint about her conduct and manner typifies her behavior for the past several years." (Sand. Decl. ¶ 23, Ex. 16).

The Union declined to arbitrate Budansingh's case.  (Babb Aff. ¶ 6).  Pursuant to the 1199 Constitution, Budansingh presented the grievance to the BIMC Chapter Hearing and Appeals Board ("Chapter Board") -- a body of Union delegates from the Hospital which has the authority to direct that the Union proceed to arbitration -- and requested that the grievance proceed to arbitration.  (Ortiz Aff. ¶ 18; Dorn Decl. ¶ 11, Ex. 10; Pl. Union Tr. 9-10).  Budansingh was assisted in presenting her case to the Chapter Board by Union Delegate Cecilio Simons (Ortiz Aff. ¶ 18; Pl. Union Tr. 9-10).  However, the Chapter Board determined that the matter should not be submitted to arbitration and Budansingh was informed of that decision on or about January 30, 2007.  (Ortiz Aff. ¶ 19; Pl. Union Tr. 10; Dorn Decl. ¶ 8, Ex. 7).  Budansingh then appealed the decision not to arbitrate her termination to the Division Hearing and Appeals Board ("Division Board ") - a body of 1199 delegates from various institutions in the Union's Health Systems Division -- as was her right under the Union Constitution.  (Babb Aff. ¶ 10; Pl. Union Tr. 11-12).  However, the Division Board upheld the decision not to arbitrate, finding "that there is virtually no likelihood of succeeding at arbitration." (Complaint ¶¶ 37-39).  Budansingh also filed a charge with the NLRB claiming that the Union breached its DFR, which she later withdrew.  (Pl. Union Tr. 30).

## O.    Budansingh Brings The Instant Lawsuit Against BIMC And The Union

On April 29, 2008, Budansingh brought the instant action against the Hospital and the Union for wrongful discharge pursuant to Section 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), alleging that: (1) the Union breached its DFR by failing to

arbitrate the denial of her discharge grievance; and (2) the Hospital violated the provision of the

CBA that requires "cause" for her discharge.  (Complaint ¶ 50).

## ARGUMENT

### SUMMARY JUDGMENT SHOULD BE GRANTED TO DEFENDANTS BECAUSE PLAINTIFF CANNOT SHOW THAT THE UNION BREACHED ITS DUTY OF FAIR REPRESENTATION OR THAT THE HOSPITAL BREACHED THE CBA

**A.    Applicable Legal Standards**

      **1.    The Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers
> to interrogatories, and admissions on file, together with the
> affidavits, if any, show that there is no genuine issue as to any
> material fact and that the moving party is entitled to a judgment as
> a matter of law.

*See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Matsushita Elec. Indus. Co.*

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986); *Lang v. Ret. Living Pub. Co.*, 949

F.2d 576, 580 (2d Cir. 1991).

    While the burden of showing that no genuine factual dispute exists rests on the party

seeking summary judgment, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Chambers*

*v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994); *Gallo v. Prudential Residential Servs.,*

*Ltd. P'ship.*, 22 F.3d 1219, 1223 (2d Cir. 1994),

> the movant's burden will be satisfied if he can point to an absence
> of evidence to support an essential element of the nonmoving
> party's claim.

*Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  *See also*

*Gallo*, 22 F.3d at 1223-1224 (moving party may obtain summary judgment by showing that little

or no evidence may be found to support nonmoving party's claim).  The moving party "does not

bear the burden of disproving an essential element of the nonmoving party's claim." *Van*

*Lawrence v. The Schubert Org., Inc.*, No. 94 Civ. 2591, 1996 U.S. Dist. LEXIS 2903 at *6-7 (S.D.N.Y. Mar. 12, 1996).

It is well settled that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. "A fact is material when it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007). An issue of fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[C]onclusory allegations will not suffice to create a genuine issue." *H. R. Co. v. Conrail,* 902 F.2d 174,178 (2d Cir. 1990).

The nonmoving party cannot meet its burden through reliance on unsupported assertions, contentions that the affidavits supporting the motion are not credible, or "upon the mere allegations or denials of the adverse party's pleading." Fed. R. Civ. P. 56(e); *Goenaga*, 51 F.3d at 18. Moreover, "the non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts . . . or defeat the motion through mere speculation and conjecture." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (citations and internal quotations omitted).

In *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986), the Court urged litigants in this circuit to make greater use of summary judgment motions, remarking:

> It appears in this circuit some litigants are reluctant to make full
> use of the summary judgment process because of their perception
> that this court is unsympathetic to such motions and frequently
> reverses grants of summary judgment. Whatever may have been
> the accuracy of this view in years gone by, it is decidedly
> inaccurate at the present time ...

20

We show below that plaintiff cannot present evidence that there are any triable issues of material fact and that Defendants are therefore entitled to summary judgment.

### 2. Standards for the DFR and the Hybrid §301/DFR Claim

Budansingh can defeat Defendants' Motion for Summary Judgment only by asserting facts, not merely legal conclusions, showing 1) that the Union's actions were "arbitrary, discriminatory or in bad faith"; and 2) that those actions "seriously undermine[d] the arbitral process." *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 129 (2d Cir. 2003) (quoting *Barr v. United Parcel Serv.*, 868 F.2d 36, 43 (2d Cir. 1989)). Arbitrary, in this context, means irrational. *See Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 129 (2d Cir. 1998).

As plaintiff brings the instant action pursuant to Section 301 of the Labor Management Relations Act against the Hospital for breach of the Collective Bargaining Agreement ("CBA") and against the Union for a breach of the DFR, "[her] claim is a 'hybrid § 301/fair representation' action." *Tomney v. Int'l Ctr. for the Disabled*, 357 F.Supp.2d 721, 735 (S.D.N.Y. 2005). A plaintiff in a hybrid §301/DFR action "may sue the union or the employer, or both, but in any case must allege violations on the part of both." *Id.* (citing *Del Costello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 165 (1983)); *Carrion v. Enter. Ass'n, Metal Trades Branch Local Union 638*, 227 F.3d 29, 34 (2d Cir. 2000).

"To establish a hybrid § 301/DFR claim, a plaintiff must prove both (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation vis-à-vis the union members." *White v. White Rose Food*, 237 F.3d 174, 178-79 (2d Cir. 2001). Due to the fact that the hybrid § 301/DFR claim is a combination of two distinct yet inextricably interdependent causes of action, the plaintiff must prove each prong of the claim in order to be successful. *See Del Costello*, 462 U.S. at 164-65; *Wilder v. GL Bus Lines*, 258 F.3d 126, 129 (2d Cir. 2001).

21

"The U.S. Court of Appeals for the Second Circuit has explained that 'the Union's breach is a prerequisite to consideration of the merits of plaintiff's claim against [a] former employer for improper discharge.'" *Jordan v. Viacom Outdoor Group*, 475 F. Supp. 2d 440, 444 (S.D.N.Y. 2007) (quoting *Young v. U.S.P.S.*, 907 F.2d 305, 307 (2d Cir. 1990)) ("[T]he 'threshold issue' is whether the union has breached its duty of fair representation."); *see also Farkas v. Ellis*, 780 F. Supp. 1013, 1017 (S.D.N.Y. 1992) ("An indispensable predicate to a Section 301 action is a demonstration that the Union breached its duty of fair representation."). ("If a plaintiff cannot make this threshold showing, [her] hybrid section 301/duty of fair representation action fails, and neither the union nor the employer can be held liable for [her] discharge.") *Jordan*, 475 F. Supp. 2d at 444. *See also White*, 237 F.3d at 183 (The "plaintiffs' failure to establish their DFR claim against the union means that their hybrid §301/DFR claim against [the employer] necessarily fails as well.").

In the seminal case of *Vaca v. Sipes*, 386 U.S. 171 (1967), the court defined the judicially developed doctrine of the DFR and recognized the Union's status as exclusive bargaining agent as the source of the duty:

> [T]he exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

*Vaca*, 386 U.S. at 177.

However, in *Vaca*, the Court clearly stated that the existence of the duty did not mean that each individual employee had an absolute right to have his or her grievance processed to arbitration. The court reasoned that:

> If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery

22

> provided by the contract would be substantially undermined . . .
> [and] a significantly greater number of grievances would proceed
> to arbitration. This would greatly increase the cost of the
> grievance machinery and could so overburden the arbitration
> process as to prevent it from functioning successfully.

*Vaca*, 386 U.S. at 191-92.

In *Vaca*, the Court defined the breach of the DFR as involving "conduct toward a member [that] is arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190. The Supreme Court reaffirmed the standard for determining whether, in a given situation, the DFR is breached in *Airline Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65 (1991), where it again decided that a union breaches its DFR only if its actions are arbitrary, discriminatory or made in bad faith.

**B.    The Union Did Not Act Unreasonably, Arbitrarily,
In Bad Faith Or With Discriminatory Intent.**

In this Circuit, the courts have held that a "union acts in bad faith when it acts with an improper intent, purpose, or motive . . . Bad faith encompasses fraud, dishonesty, and other intentionally misleading conduct." *Spellacy*, 156 F.3d at 126 (citations omitted); *Lavigna v. Capital Cities*, No. 96 Civ. 7734, 2000 WL 1772792, at *3 (S.D.N.Y. Nov. 30, 2000).

A union's conduct is considered discriminatory only if the union's actions are invidious. *See Considine v. Newspaper Agency Corp.*, 43 F.3d 1349, 1359-60 (10th Cir. 1994) ("[D]iscrimination is invidious if based upon impermissible or immutable classifications such as race or other constitutionally protected categories, or arises from prejudice or animus.") These standards create a substantial burden for a plaintiff to overcome, a hurdle established to ensure that a court does not "substitute its own view of the proper bargain for that reached by the union." *Airline Pilots Ass'n*, 499 U.S. at 78.

Budansingh has presented no evidence whatsoever to show that the Union acted from tainted or impure motives. The Union has filed grievances on Budansingh's behalf, investigated

the facts concerning the termination, and attempted to convince the Hospital to rescind the termination.

In sum, Budansingh has not alleged, let alone shown, that the Union's decision was motivated by personal or internal Union political animus, or by racial or ethnic discrimination. There is simply no evidence of the type of conduct that would satisfy the bad faith or discrimination components necessary to prevail in a DFR case.

The Supreme Court's decision in *O'Neill*, explicates the "arbitrariness component" of the "tripartite standard announced in *Vaca v. Sipes*." 499 U.S. at 77. *O'Neill* holds that "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' as to be irrational." *Id.* at 67 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)). As the Court explained, the DFR doctrine entails a "highly deferential" standard of reviewing cases where there is no allegation of invidious discrimination or bad faith, because "Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union." *Id.* at 78.

Citing cases involving judicial review of legislative choices, the *O'Neill* Court noted that "Congress envisioned the relationship between the courts and labor unions as similar to that between the courts and the legislature." *Id.* Thus, "*O'Neill* analogized the Union's choice to that of a legislature, subject to the most deferential judicial review." *Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524, 1532 (7th Cir. 1992). "This standard of review is a paradigm of judicial restraint." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993). "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those

judgments are ultimately wrong." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45-46 (1998).

Succinctly stated, Budansingh asserts that the Union represented her perfunctorily in grieving her termination. This claim cannot be sustained. Union representatives met with her prior to the Step III grievance meeting, argued on her behalf at that hearing, stated that her termination should not be upheld as some of the prior conduct relied upon in discharging her had not been issued as discipline, and that she did not engage in the conduct for which she was terminated. (Ortiz Aff. ¶¶ 7, 11, 13, 16). In addition, the Union presented statements by two patients in support of Budansingh at that hearing. (Ortiz Aff. ¶ 8 (a) and (b); Dorn Decl. ¶¶12, 13, Exs. 11, 12).

The Union's decision was based on a number of factors. One was that not one of her co-workers would testify on her behalf as their two memoranda complaining of her behavior and attitude attest. (Babb Aff. ¶ 7). Another was that there were a number of witnesses who either testified at the Step III hearing or whose statements were presented there that each had spoken with J.C., the patient who had complained of Budansingh's behavior in writing, and had confirmed his claim that Budansingh had threatened him and had violated Hospital rules regarding patient confidentiality. (Babb Aff. ¶ 6). Since the CBA specifically exempts patients from having to appear at an arbitration hearing, these witnesses and their statements would be highly persuasive.[2] Finally, Budansingh was aware of the Hospital's strict policy on patient confidentiality which was especially strong in the MMTP Treatment clinics. Therefore, even if

---

[2] The CBA, provides: "If the discharge of an Employee results from conduct relating to a patient and the patient does not appear at the arbitration, the arbitrator shall not consider the failure of the patient to appear as prejudicial." Article XXIX, Section 3. (Sand. Decl. ¶ 7, Ex. 3).

her prior record had not been considered, it would have been highly unlikely that an arbitration could have been successfully pursued. (Babb Aff. ¶ 8).

After the Union made its decision not to take her case to arbitration, Budansingh was notified that she had the right to appeal to a Chapter Hearing and Appeals Board consisting of members of the Union employed by the Hospital who had the authority to reverse the Union's determination and direct it to take the case to arbitration. (Ortiz Aff. ¶ 18). Budansingh did appeal and was represented by a Union delegate who argued on her behalf. (Ortiz Aff. ¶ 18). The Board upheld the decision of the Union. Budansingh then appealed to the Health Systems Division Board which consists of members of the Union who are employed at institutions other than the Hospital. Again, a Union delegate argued for Budansingh that the Board should direct the Union to proceed to arbitration. Again, however, the Division Board upheld the Union's decision. (Babb Aff. 10)

In *Barr*, the plaintiff alleged, as Budansingh does in the instant action, that the union breached the DFR by failing to adequately prepare the case. The court unequivocally rejected this basis for a DFR claim:

> In hindsight, any decision a union makes in the informal yet complex process of handling its members' grievances may appear to the losing employee to have been erroneous. The decisions taken here by Local 804 were tactical in nature. At most, they may have been errors of judgment. In any event, they were not so egregious as to be evidence of bad faith and failure fairly to represent Barr.
>
> Tactical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach. Proof of mere negligence or errors of judgment . . . is insufficient . . . "'As long as the union acts in good faith, the courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular disadvantage.'"

*Barr*, 868 F.2d at 43-44 (citing *Cook v. Pan Am. World Airways, Inc.*, 771 F.2d 635, 645 (2d Cir. 1985) (quoting *Capobianco v. Brink's, Inc.*, 543 F.Supp. 971, 975 (E.D.N.Y. 1982), *aff'd mem.*, 722 F.2d 727 (2d Cir. 1983))).

The deference afforded to union's in presenting grievances is so great that the 9th Circuit noted that it "[has] never held that a union has acted in an arbitrary manner where the challenged conduct involved the union's judgment as to how best to handle a grievance. To the contrary, we have held consistently that unions are not liable for good faith, non-discriminatory errors of judgment made in the processing of grievances." *Peterson v. Kennedy*, 771 F.2d 1244, 1254 (9th Cir. 1985).

Applying these principles to Budansingh's claim makes it clear that there is no evidence to support a claim that the union breached its DFR. Budansingh's complaint is that the union did not take her case to arbitration. As the court noted in *Vaca*, a union is not obligated to proceed to arbitration if it concludes that a grievance has no merit. *See also Miller v. U.S. Postal Serv.*, 985 F.2d 9, 12 n.3 (1st Cir. 1993) ("To continue a meritless grievance adversely affects the Union's credibility and finances").

Union representatives investigated the situation, and based on their findings concluded that the grievance did not have sufficient merit to warrant taking it to arbitration. Whether their conclusion was correct or not, is not the issue, although it is difficult to reach a contrary conclusion based on the facts as they then existed.

A Union's conduct is not arbitrary "simply because of an error in evaluating the merits of a grievance, in interpreting particular provisions of a collective bargaining agreement, or in presenting the grievance at an arbitration hearing." *Peterson*, 771 F.2d at 1254. (citing *Dutrisac v. Caterpillar Tractor Co.*, 749 F.2d 1270, 1273 (9th Cir. 1983)). Simply put, an error in

judgment by the Union, even if one was made, does not constitute bad faith and is not arbitrary. *See Burkevich v. Airline Pilots Assoc. Int'l*, 894 F.2d 346, 352 (9th Cir. 1990).

The Second Circuit has held that "the duty of fair representation is not breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance." *Cruz v. Local Union No. 3 of IBEW*, 34 F.3d 1148, 1153-54 (2d Cir. 1994).

The Union does not have the burden of proof to show that its actions were not arbitrary. Nevertheless, the facts affirmatively demonstrate the Union's good faith and its reasoning in deciding as it did. Even assuming the Union's evaluation of Budansingh's case to be wrong, defective or debatable, there is no breach of its duty of fair representation. The Union's decision was taken in good faith and was reasonable and reasoned. More to the point legally, Budansingh has not shown that the Union's action was made in bad faith, was arbitrary, or based on discriminatory reasons. Therefore, the Motion for Summary Judgment should be granted.

**C.    Alternatively, Summary Judgment Is Appropriate
Because There Was No Causal Connection Between
The Union's Conduct And Budansingh's Termination**

"In order for a plaintiff to recover on a DFR claim, the union's action or inaction must have been such that it would have changed the outcome of a grievance in the plaintiff's favor." *Shider v. New York Telephone Co.*, 2004 U.S. Dist. LEXIS 5068, at *24 (S.D.N.Y. Mar. 29, 2004), *aff'd*, No. 04-2616, 2005 U.S. Dist. LEXIS 2231 (2d Cir. Oct. 17, 2005). Budansingh's termination was not at all causally connected to the Union's conduct. Rather, it was a result of her threatening a patient and for violations of the Hospital's confidentiality policy. As set forth below, even had the Union decided to proceed to arbitration, Budansingh was unlikely to prevail. Thus, there is no link between the Union's conduct and Budansingh's termination. *See Shider*, 2004 U.S. Dist. LEXIS 5068, at *24-25 (no causal connection between the plaintiff's termination

and the union's conduct because termination was the result of the plaintiff's violation of
company policy and because the claim was unlikely to succeed at arbitration); *Blossomgame v.
United Presbyterian Residence*, No. 02-1594, 2004 U.S. Dist. LEXIS 18246, at *36 (E.D.N.Y.
Sept. 10, 2004) (no causal connection between the plaintiff's demotion and the union's conduct
because demotion was the result of the plaintiff's poor job performance).

**D.     Even If Plaintiff Could Establish A Genuine Issue Of Material Fact
         On Her DFR Claim, She Cannot Show That BIMC Breached The CBA**

As discussed above, the record evidence establishes that there is no genuine issue of
material fact on Plaintiff's DFR claim and, for this reason, summary judgment should be granted
to BIMC and the Union. Even if Plaintiff could establish a genuine issue of material fact on this
claim (which she cannot), Budansingh cannot show that BIMC violated the CBA.

**1.     Standards For A Breach Of CBA Claim**

"Collective bargaining agreements 'are contracts that remain subject to the general
principles of contract law.'" *Palancia v. Roosevelt Raceway, Inc.*, 551 F. Supp. 549, 553
(E.D.N.Y. 1982) (citation omitted). Under the LMRA, federal courts have the power to construe
the applicable CBA to determine whether the employer breached its provisions. *Id.* at 553; *see
also Johnson v. Soft Drink Workers Union, Local 812*, 568 F. Supp. 1203, 1205 (S.D.N.Y. 1983).
In interpreting the CBA, courts consider the parties' intent during contract negotiations, "past
conduct and bargaining history, as well as industry practice." *Hotel Greystone Corp. v. New
York Hotel and Motel Trades Council, AFL-CIO*, 902 F. Supp. 482, 485 n.1 (S.D.N.Y. 1995);
*Johnson*, 568 F. Supp. at 1205 (granting summary judgment for employer and union in hybrid
§301/LMRA claim, where the CBA language and extrinsic evidence, including the union's
president's affidavit regarding the intent of the parties during contract negotiations, supported the
employer's decision to summarily discharge plaintiff); *see also Acheson v. Falstaff Brewing*

*Corp.*, 523 F.2d 1327, 1330 (9th Cir. 1975) (stating that it is the "fundamental rule of contract negotation that great weight should be given to the interpretation of the contract by the parties, thereto" has been applied to the interpretation of a CBA under LMRA Section 301). Additionally, courts look to whether or not the employer had a "reasonable interpretation" of the CBA or if it acted arbitrarily in applying its provisions. See *Lalley v. Bethlehem Steel Corp.*, 703 F. Supp. 1047, 1049, 1052-1053 (W.D.N.Y. 1989).

### 2.  <u>BIMC Did Not Violate The CBA</u>

The gravamen of Plaintiff's Complaint is that BIMC did not have "cause" to discharge her pursuant to the terms of the CBA. The undisputed record evidence establishes, however, that BIMC had ample cause to discharge Plaintiff because the Hospital has policies in place that expressly prohibit the type of behavior engaged in by Budansingh toward patient J.C. Those same policies provide that an employee who engages in the prohibited behavior is subject to discharge. Plaintiff's conduct toward patient J.C. was fully consistent with her substantial prior history of similar behavior and there can be no serious doubt that threatening a patient and breaching a patient's confidentiality is cause for discharge. The correctness of the decision to discharge Plaintiff is further confirmed by the fact that Plaintiff was either unwilling or unable to modify her behavior and stated that she saw no reason to do so. Under these circumstances, BIMC has interpreted and applied the CBA's cause provision (an interpretation with which 1199 agrees) to warrant an employee's discharge. Plaintiff has failed to come forward with any evidence (because there is none) that BIMC has failed to discharge an employee who engaged in conduct similar to the conduct exhibited by Plaintiff.

The CBA provides that BIMC "shall have the right to discharge, suspend or discipline any Employee for cause." In addition, Plaintiff admitted at her deposition that she received

BIMC's Employee Handbook, and that it lists the grounds that provide cause for discharge, including "threatening, intimidating, coercing or fighting with an employee, patient or visitor, by word or action" and "the improper or unauthorized use or disclosure of confidential information." (Pl. Tr. 101-02, 105, Hosp. Ex. D). Plaintiff further admitted that to protect patient confidentiality the MMTP prohibits counselors from speaking with patients outside of the clinic building. (Pl. Tr. 305). Plaintiff knew that she could be fired if she violated any of these rules. (Pl. Tr. 106).

The record evidence establishes beyond any serious doubt that Plaintiff threatened patient J.C. and beached his confidentiality by speaking to him outside the clinic. No fewer than five MMTP employees, the Supervisor of Vocational Services, the Clinic Manager/Clinic 8D, the Assistant Supervisor of Clinic 8D, a Patient Advocate and the patient's primary counselor, met with J.C. to investigate his complaint that Budansingh confronted him outside of the Clinic about his June 2006 complaint, made threatening and intimidating statements to him about that complaint, and told him that he should meet with her husband, who was not an MMTP employee. All five of those employees provided signed written statements regarding their meetings with J.C. and all of them credited his version of his interactions with Plaintiff. Budansingh admits that she has no evidence that anyone coerced these employees into preparing these statements or into believing the patient's version of events. (Pl. Tr. 324-34). Based on Plaintiff's misconduct toward J.C., BIMC had sufficient cause to terminate her employment.

The decision to credit the patient's complaint against Plaintiff is bolstered by the record evidence that, in April 2006 and then again only two months later in June 2006, Budansingh was counseled about her behavior towards staff and patients, including toward patient J.C. Despite this counseling, Plaintiff insisted that she saw no need to change her behavior in any way. (Pl.

Tr. 240, 273).  Indeed, Plaintiff held firm to her view, even after the second counseling session, that she saw no need to "change anything about the way [she] communicated with patients after the June 2006 meeting."  (Pl. Tr. 273).

In the face of this substantial body of evidence establishing cause for her discharge, Plaintiff offers only self-serving denials regarding her interactions with the patient and relies on her purely subjective opinion to argue that that her coworkers set her up for discharge.  Her "conclusory allegations unsubstantiated by any evidence . . . [do] not rise to the level of hard evidence that is required to survive summary judgment."  *Jordan*, 475 F. Supp. 2d at 445.  Plaintiff's denials of any wrongdoing are unpersuasive.  Budansingh's entire employment history at BIMC is replete with examples of her unwillingness to accept responsibility for her own actions and her penchant for blaming others in an attempt to cover up and explain away her own shortcomings.  Based on this course of conduct, it came as no surprise to BIMC that Plaintiff would deny the patient's allegations against her and accuse managers and co-workers of trying to get her fired.  BIMC correctly rejected Plaintiff's latest and final attempt to avoid the consequences of her own actions.

Accordingly, BIMC had cause to discharge Budansingh and summary judgment should be granted to the Hospital and the Union on Plaintiff's breach of the CBA claim.

## CONCLUSION

For each and all of the foregoing reasons, Defendants' joint motion for summary judgment should be granted and Plaintiff's claims against Defendants should be dismissed in their entirety pursuant to Fed. R. Civ. P. 56.

Dated: December 18, 2009
      New York, New York

                       EDWARDS, ANGELL, PALMER & DODGE LLP

                       By:   /s Rory J. McEvoy
                              Rory J. McEvoy
                              Attorneys for Defendant Beth Israel
                              Medical Center
                              750 Lexington Avenue
                              New York, NY 10022
                              212.308.4411
                              212.308.4844 (fax)
                              rmcevoy@eapdlaw.com

                       LEVY RATNER, P.C.

                       By:   /s Richard Dorn
                              Richard Dorn
                              Attorneys for Defendant 1199SEIU United
                              Healthcare Workers East
                              80 Eighth Avenue
                              New York, New York 10011
                              (212) 627-8100
                              (212) 627-8182 (fax)
                              Rdorn@levyratner.com