UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――

No. 08 Civ. 3356 (RJS)

―――――――――――――

SANDRA BUDANSINGH,

Plaintiff,

VERSUS

BETH ISRAEL MEDICAL CENTER, ET AL.,

Defendants.

―――――――――――――

MEMORANDUM AND ORDER
July 19, 2010

―――――――――――――

RICHARD J. SULLIVAN, District Judge:

Plaintiff Sandra Budansingh brings this action against Defendant Beth Israel Medical Center (the "Hospital" or "Beth Israel") for wrongful termination and Defendant Local 1199 Service Employees International Union (the "Union") for breach of its duty of fair representation, pursuant to Section 301(a) of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 185(a). Now before the Court is Defendants' joint motion for summary judgment on all of Plaintiff's claims. For the following reasons, Defendants' motion is granted.

I. BACKGROUND

A. Facts[1]

Beth Israel operates a Methadone Maintenance Treatment Program (the "MMTP"), which consists of eighteen clinics serving over 6000 opioid-addicted patients. (Defs.' 56.1 ¶ 3.) Patients at the MMTP are treated by substance abuse

―――――――――

[1] As detailed in the Procedural History section below, Plaintiff failed to file a proper opposition memorandum, as well as a response to Defendants' Local Rule 56.1 Statement. Accordingly, the Court has accepted as true all of the facts in Defendants' Joint Motion for Summary Judgment.

counselors, all of whom are members of the Union. (*Id.* ¶¶ 5, 11.)[2]

Beth Israel and the Union are parties to a collective bargaining agreement (the "CBA") that governs the terms and conditions of the substance abuse counselors' employment. (*Id.* ¶ 12.) The CBA gives the Hospital "the right to discharge, suspend or discipline any Employee for cause." (Sanders Decl., Ex. 3 at 87.) The Hospital's employee handbook, furthermore, provides that any "serious" employee misconduct can result in "immediate disciplinary actions, up to and including suspension and discharge." (Sanders Decl., Ex. 4 at 4.) Serious employee misconduct includes "[t]hreatening, intimidating, coercing or fighting with an employee, patient, or visitor, by word or action." (*Id.*) "Improper or unauthorized use or disclosure of confidential information can [also] result in . . . discharge."[3] (*Id.* at 24.)

Under the CBA, Hospital employees who wish to contest a disciplinary action may file a "grievance."[4] (Defs.' 56.1 ¶ 14.)

Bringing a grievance ordinarily initiates a process consisting of three steps. (Sanders Decl., Ex. 3 at 88-90.) An employee grieving a suspension or discharge, however, automatically advances the procedure to its third and final step, which consists of a hearing (the "Step III hearing") and the issuance of a written decision (Defs.' 56.1 ¶ 15). After the Step III hearing and issuance of a written decision, the Union or the Hospital "may" appeal the decision by referring the case to arbitration. (Sanders Decl., Ex. 3 at 93.)

### 1. Plaintiff's Employment Before the MMTP

From 1993 to 1999, Plaintiff worked as a substance abuse counselor at the Albert Einstein College of Medicine (the "College"). (Defs.' 56.1 ¶ 22.) During that time, she was a member of the Union. (*Id.* ¶ 23.) Plaintiff's employment at the College ended when a patient complained that Plaintiff intimidated her. (*Id.* ¶ 24.) Initially, the College allowed Plaintiff to resign in lieu of being terminated, and Plaintiff did so. (*Id.*) The next day, however, Plaintiff rescinded her resignation, and the College terminated her employment. (*Id.* ¶ 25.) After the Union determined not to challenge Plaintiff's termination, Plaintiff filed a complaint with the National Labor Relations Board (the "NLRB"), alleging that the Union breached its duty of fair representation. (*Id.* ¶ 26.) The NLRB dismissed her claim. (*Id.* ¶ 27.)

### 2. Clinic 6/7 and Clinic 3

In November 1999, Plaintiff began her employment as a substance abuse counselor at the MMTP's Clinic 6/7. (*Id.* ¶ 28.) In April 2000, Plaintiff received a one-day

---

[2] The Union "represents voluntary hospital workers at [Beth Israel] and other institutions located throughout New York City." (Defs.' 56.1 ¶ 11.)

[3] MMTP counselors are subject to "New York state and federal statutes and regulations governing the protection of confidential patient information, as set forth in the MMTP's policy on the Confidentiality of MMTP Patient Records and HIV Related Information, which strictly prohibits the disclosure of the identity or information of individuals enrolled in a drug treatment program without their written consent." (Sanders Decl. ¶ 6.) The MMTP, furthermore, "requires that counselors refrain from interacting with patients outside of the clinic so that the public does not identify them as a patient of the clinic." (*Id.*)

[4] "A grievance [is] defined as a dispute or complaint arising between the parties hereto under or out of [the CBA] or the interpretation, application, performance, termination, or any alleged breach thereof . . . ." (Sanders Decl., Ex. 3 at 88.)

suspension after she slammed a patient's chart on her clinic manager's table, berated him in a loud voice, told him that he "behave[s] like Hitler," stormed out of his office, continued to berate him, and was sent home. (Dorn Decl., Ex. 1.) After this incident, the Union filed a grievance on Plaintiff's behalf, but the grievance was denied in a written decision after a Step III hearing. (Dorn Decl., Ex. 3.)

"After continuing difficulties with the [c]linic [m]anager," Plaintiff requested a transfer to a new clinic. (Defs.' 56.1 ¶ 31.) The MMTP granted her request and transferred her to Clinic 3, which was on a different floor and had a different clinic manager from Clinic 6/7. (*Id.* ¶ 32.) After having difficulty interacting with her co-workers, Plaintiff asked to be transferred out of Clinic 3. (*Id.* ¶ 33.)

### 3. Clinic 8D

In October 2004, Plaintiff was transferred to Clinic 8D, in which Alexander Jackson was the clinic manager. (*Id.* ¶¶ 35-36.) From Plaintiff's arrival at the clinic through January 2005,

> counselors, nursing staff, and patients told Jackson that Budansingh: berated a patient; accused another patient of faking psychiatric issues; refused to work with a patient who spoke with a Spanish accent; refused to speak with a co-worker due to a disagreement; told a patient that a counselor disliked him; humiliated a patient regarding his urine sample in front of the staff and patients; embarrassed a patient for being late in front the staff and patients; and loudly stated patients' personal business in the open area of the clinic. In addition, three of Budansingh's patients requested a new counselor.

(*Id.* ¶ 37; Jackson Aff., Ex. 1.) Plaintiff's 2005 review reflected that Plaintiff "needs to work on her social skills as to better interact with her co-workers and treatment team." (Jackson Aff., Ex. 4.) In response to this review, Plaintiff wrote a rebuttal, which blamed her problems on certain co-workers. (*Id.*)

As Jackson's Affirmation recounts in detail, on June 21 and again on June 22, 2005, Plaintiff refused to treat certain patients. (*Id.* ¶ 4.) Jackson interviewed a security guard and secretary who had witnessed Plaintiff's behavior and then met with Plaintiff, who denied any wrongdoing. (*Id.*) In the next several days, Plaintiff "made six unauthorized calls to the security guard's employer requesting that the employer remove the security guard." (*Id.*) She also called the secretary, threatened to write her up, and told her that she was "acting like those Niggers!" (*Id.*) On July 7, 2010, Jackson issued Plaintiff a final warning in lieu of a one-day suspension. (*Id.*, Ex. 2.) In response, the Union filed a grievance on Plaintiff's behalf. (Defs.' 56.1 ¶ 50.) After a Step III hearing, the hearing officer upheld the final warning because credible evidence established that Plaintiff acted in a "very unprofessional" manner. (Dorn. Decl., Ex. 5 at 4.)

On July 14, 2005, Plaintiff's co-workers submitted a petition to Jackson and the MMTP administration complaining about Plaintiff's "relentless unprofessional and destructive behavior." (Jackson Aff., Ex. 3.) They asked for Plaintiff to "be relocated from Clinic 8D as her erratic, abusive, racist, and unprofessional behavior seems to be escalating rather than dissipating." (*Id.*)

In December 2005, one of Plaintiff's patients requested a new counselor because Plaintiff yelled at and humiliated him. (Defs. 56.1 ¶¶ 52-53.) Plaintiff told Jackson that the patient misinterpreted her actions. (*Id.* ¶ 54.)

In Plaintiff's 2006 review, Jackson expressed similar concerns as those in Plaintiff's 2005 review. Namely, Jackson said that Plaintiff did not meet expectations in her ability to demonstrate "a professional, courteous, and respectful attitude in dealing with patients, families, and significant others" and in her ability to display "courtesy, tact and patience during interactions with all members of the hospital staff and extended community." (Jackson Aff., Ex. 5.) Jackson recommended that Plaintiff "attend specialized training through Human Resources that will help her in the areas of patient and staff communication." (*Id.*) Plaintiff, however, never did so. (Defs.' 56.1 ¶ 57.)

On April 13, 2006, Plaintiff met with Millie Gonzalez-Haig, who was the MMTP's Assistant Director of Program and Staff Development, and a Union delegate. (Sanders Decl., Ex. 6.) They discussed Plaintiff's repeated misbehavior, and Plaintiff agreed to use "mechanisms that [would] prevent [her] from losing [her] temper and getting emotional in an inappropriate and disruptive manner" and agreed to make "every effort to get along with [her] colleagues" and "every effort to cease blaming others for [her] behaviors." (*Id.*) Gonzalez-Haig warned Plaintiff that "any further incidents of disruptive and inappropriate behavior will result in progressive disciplinary action up to [and] including termination of employment." (*Id.*)

On April 25, 2006, the Clinic D staff submitted another memorandum to the MMTP complaining that Plaintiff "continues to be a disruptive influence in our otherwise peaceful clinic." (*Id.* Ex. 7.) The staff explained that Plaintiff makes "racist remarks," "screams and yells at both patients and staff," "is blatantly disrespectful to the [c]linic [m]anager," "has attempted to pit staff against staff and to manipulate patients in an entirely corrupt and inappropriate manner," and "is an overall hostile and negative influence on the clinic." (*Id.*) The staff requested that the MMTP "intercede on [its] behalf." (*Id.*)

4. Plaintiff's Termination

On May 15, 2006, a patient named J.C. complained to Jackson that Plaintiff treated him in a disrespectful manner, snatched his identification card from his hand, and complained about having to assist him. (Jackson Aff. ¶ 12.) Jackson brought the complaint to Gonzalez-Haig's attention, and Gonzalez-Haig advised Jackson to ask J.C. to submit a written complaint. (*Id.* Ex. 8.) On June 4, 2006, J.C. submitted his written complaint in the form of a letter. (Sanders Decl., Ex. 9.)

The MMTP responded by organizing a June 13, 2006 meeting at which Plaintiff, a Union representative, and MMTP administrators were present. (Defs.' 56.1 ¶ 73; Sanders Decl. Ex. 10.) The administrators counseled Plaintiff on how she should have behaved when interacting with J.C., and they reviewed the agreements reached at the April 13, 2006 meeting. (Defs.' 56.1 ¶¶ 74-75.) Additionally, they again warned Plaintiff that "further incidents of disruptive and inappropriate behavior to staff or patients . . . will result in progressive disciplinary action up to and including termination of employment." (Sanders Decl., Ex. 10.)

Nevertheless, on the morning of October 26, 2006, Michelle Mosley, who

served as J.C.'s primary counselor, observed J.C. leaving Plaintiff's office and asked him why he had been there. (Defs.' 56.1 ¶ 79.) Visibly upset and agitated, J.C. said that Plaintiff invited him into her office to ask him about his written complaint and whether he had been "coerced into writing the letter." (*Id.* ¶¶ 80-81.) J.C. also told Mosley that he feared retaliation because of his June 4, 2006 written complaint. (Sanders Decl., Ex. 11.) Later, J.C. told Arlann Walker, the MMTP's Supervisor of Vocational Services, that Plaintiff tried to intimidate him by saying that her husband wanted to meet with him because both her husband and J.C. were of Italian descent. (Walker Aff., Ex. 1.)

On October 30, 2006, J.C. met with Jackson and Calvin Grant, Clinic 8D's assistant supervisor. (Defs.' 56.1 ¶ 89.) J.C. told them that Plaintiff had first confronted him outside of the Clinic 8D building several weeks earlier and told him that his complaint letter "could result in getting her fired." (*Id.*) J.C. further stated that Plaintiff breached his confidentiality by confronting him outside of the clinic and that she was trying to intimidate him. (Jackson Aff., Ex. 12.) J.C. also told the Hospital's Patient Advocate, Peter Vanderkloot, that he felt threatened by Plaintiff and uncomfortable knowing that she had access to his chart and home address. (Sanders Decl., Ex. 14.)

At a November 1, 2006 meeting with MMTP administrators, Jackson, and a Union representative, Plaintiff denied that the incident involving J.C. occurred as J.C. described it. (Defs.' 56.1 ¶¶ 100-02.) Rather, she maintained that J.C. came to her office to apologize for making the June complaint against her. (Sanders Decl. ¶ 22.) Plaintiff said that J.C. told her that he made the complaint because Mosley and Jackson offered him favorable treatment in exchange for doing so. (*Id.*) After hearing Plaintiff's explanation, the MMTP administrators terminated Plaintiff's employment. (Jackson Aff., Ex. 13.)

### 5. Post-Termination Proceedings

The Union filed a timely grievance on Plaintiff's behalf. ((Defs.' 56.1 ¶ 105.) Subsequently, the Union held multiple meetings with Plaintiff in order to prepare her for a December 12, 2006 Step III hearing and then represented her at the hearing. (*Id.* ¶¶ 105-12.) In addition to denying any wrongdoing by Plaintiff, the Union argued that the April 13, 2006 and July 13, 2006 meetings between Plaintiff and MMTP administrators were not disciplinary sessions, so Beth Israel failed to follow progressive discipline before discharging Plaintiff. (*Id.* ¶ 117.) In a December 27, 2006 written decision, the hearing officer upheld Plaintiff's termination. (Sanders Decl., Ex. 16.) The hearing officer explained that Plaintiff's testimony was "highly incredible" because, according to Plaintiff, "complaints about how she performs her duties are always unwarranted and result from manipulation from [m]anagers or co-workers." (*Id.*) The hearing officer concluded that "J.C.'s complaint about [Plaintiff's] conduct and manner typifies her behavior for the past several years." (*Id.*)

### 6. Denial of Arbitration

After Plaintiff's Step III hearing, the Union declined to arbitrate Plaintiff's case. (Defs.' 56.1 ¶ 124.) Plaintiff appealed this decision to the Beth Israel Chapter Hearing and Appeals Board (the "Chapter Board"), which has the authority to direct the Union to proceed to arbitration. (*Id.* ¶ 125.) With assistance from a Union representative, Plaintiff presented her case to the Chapter Board. (*Id.* ¶ 126.) Plaintiff learned on or about January 30, 2007 that the Chapter Board decided that Plaintiff's case should

not proceed to arbitration. (Dorn Decl., Ex. 7.)

Plaintiff then appealed the Chapter Board's decision to the Division Hearing and Appeals Board (the "Division Board"), which is a body of Union delegates from various institutions within the Union's Health Systems Division. (Defs.' 56.1 ¶ 128.) The Division Board found "that there is virtually no likelihood of succeeding at arbitration," and so it affirmed the Chapter Board's decision not to proceed to arbitration. (Dorn Decl., Ex.8.)

Plaintiff also filed and then withdrew a charge with the NLRB claiming that the Union breached its duty of fair representation. (Dorn Decl., Ex. 9.)

B. Procedural History

On December 4, 2007, Plaintiff filed the instant action against Beth Israel for wrongful discharge and the Union for breach of its duty of fair representation, pursuant to Section 301 of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 185(a), in New York State court. On April 4, 2008, Defendants removed the case to this Court, pursuant to 28 U.S.C. § 1441(b). Defendants filed this motion for summary judgment on December 18, 2009.

Plaintiff, however, failed to file her opposition papers, which were due on February 1, 2010. (Doc. No. 72.) The Court gave Plaintiff three additional opportunities to file a proper opposition memorandum and a response to Defendants' Local Rule 56.1 statement. (Doc. Nos. 73, 75, 76, 78.) The Court also repeatedly warned Plaintiff that failure to make a proper submission would result in the Court accepting as true all of the facts in Defendants' Joint Motion for Summary Judgment. (Doc. Nos. 73, 75, 76.) Despite these warnings, Plaintiff never submitted a proper opposition memorandum or response to Defendants' 56.1 statement. Accordingly, the Court now presumes as true all the facts in Defendants' motion papers.

II. STANDARD OF REVIEW

A court may grant a motion for summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see Anderson*, 477 U.S. at 248 (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). As such, "if there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (citation omitted) (alteration in original).

III. DISCUSSION

Plaintiff alleges that Defendants breached Section 301 of the LMRA, 29 U.S.C. § 185, in two ways: (1) the Union breached its duty of fair representation, and (2) Beth Israel violated the CBA by

terminating Plaintiff without just cause.[5] (Compl. ¶ 50.) Courts refer to a claim in which a Plaintiff sues both her Union and employer under Section 301 as "a hybrid § 301/[duty of fair representation]." *See, e.g.*, *White*, 237 F.3d at 178-79.

For Plaintiff to prevail in this hybrid § 301/duty of fair representation action, she must first prove that the Union breached its duty of fair representation and then prove that her discharge was contrary to the contract. *Saluja v. Local 1199 United Healthcare Workers E.*, No. 08 Civ. 3542, 2010 WL 324000, at *1 (2d Cir. Jan. 29, 2010) ("The indispensable predicate for [a hybrid § 301/duty of fair representation action] is . . . a demonstration that the Union breached its duty of fair representation.") (internal quotation marks omitted). "If Plaintiff cannot make this threshold showing, [her] hybrid section 301/duty of fair representation action fails, and neither the union nor the employer can be held liable for [her] discharge." *Jordan v. Viacom Outdoor Grp.*, 475 F. Supp. 2d 440, 444 (S.D.N.Y. 2007). The Court's first inquiry, therefore, is if a genuine issue of material fact exists with respect to whether the Union breached its duty of fair representation.

### A. Legal Standard

"A union breaches its duty of fair representation only if it acts in a manner that is 'arbitrary, discriminatory, or in bad faith.'" *Saluja*, 2010 WL 324000, at *1 (quoting *Vaca v. Sipes*, 386 U.S. 171, 190 (1967)). If Plaintiff can make such a showing, she "must then prove a causal connection between the union's conduct and [her] injuries." *Id.*

### B. Analysis

For the following reasons, the Court grants summary judgment to Defendants because no genuine issue of material fact exists with respect to Plaintiff's claim that the Union breached its duty of fair representation.

#### 1. Arbitrary Manner

"[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness, as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (citation and internal quotation marks omitted). "This wide range of reasonableness gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45-46 (1998) (internal quotation marks omitted). "Moreover, tactical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach." *Vaughn v. Air Line Pilots Ass'n, Int'l*, No. 08 Civ. 4173, 2010 WL 1930278, at *4 (2d Cir. May 14, 2010) (internal quotation marks omitted).

##### a. Representation

Plaintiff claims that the Union showed "a lack of passion and sometimes hostility towards [her] and made no more than perfunctory attempts at representing [her]." (Compl. ¶ 34.) Plaintiff elaborates that "[t]he Union's hostility was so strong that no union delegate with knowledge of

---

[5] "Section 301 of the LMRA governs the employer's duty to honor the collective bargaining agreement, and the duty of fair representation is implied from § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a)." *White v. White Rose Food*, 237 F.3d 174, 179 n. 3 (2d Cir. 2001).

Plaintiff's duties and responsibilities and the nature of her workplace environment was designated to represent Plaintiff until very late in the process and that person refused to speak with Plaintiff directly in order to adequately prepare." (*Id.* ¶ 35.)

No evidence before the Court, however, supports Plaintiff's claim. The Union filed a timely grievance on Plaintiff's behalf (Defs. 56.1 ¶ 105), and, only a little more than two weeks after Plaintiff's termination, three Union representatives met with Plaintiff for two hours in order to prepare her for the Step III hearing (*id.* ¶¶ 105-107; Dorn Decl., Ex. 6). At Plaintiff's request, the Union representatives met with Plaintiff again one week later to further prepare her for the hearing. (Ortiz Aff. ¶ 11.) Although at least one of the Union's representatives felt that "the Union was prepared for the Step III hearing" at that point, the Union representatives met with Plaintiff approximately three more times "to make absolutely sure that everyone was fully prepared for the hearing." (*Id.* ¶ 12.) In fact, at Plaintiff's request, the Step III hearing was postponed so that the Union representatives could further prepare Plaintiff "and so that [she felt] that the Union [was] properly prepared for [her] grievance." (Dorn Decl., Ex. 6.)

At the December 16, 2006 Step III hearing, the Union argued that Plaintiff denied engaging in the conduct for which she was terminated and that the termination should not be upheld as the MMTP did not engage in progressive disciplinary action.[6]

(Ortiz Aff. ¶ 16.) Plaintiff testified on her behalf and "was given the opportunity to speak as much as she desired." (*Id.*) The Union also presented two letters of support from Plaintiff's patients. (*Id.*; Dorn. Decl., Exs. 11-12.) After the Step III hearing, Plaintiff asked the Union to continue to represent her at least through her appeal to the Chapter Board, and the Union did so. (Ortiz Aff. ¶ 18.)

Given the facts and circumstances of Plaintiff's grievance, no jury could find that the Union breached its duty of fair representation with respect to its representation of Plaintiff.

### b. Decision To Uphold Plaintiff's Termination

Plaintiff claims that the Union "ignored" the Hospital's "very weak disciplinary case." (Compl. ¶ 44.) Specifically, she claims that J.C.'s allegations were uncorroborated and unsupported (*id.* ¶¶ 30, 40), untrue (*id.* ¶¶ 21-28), and obtained in exchange for favors (*id.* ¶¶ 23, 26). Plaintiff also alleges that J.C. had a history of making "false complaints against other [MMTP] employees." (*Id.* ¶ 24.)

Not a scintilla of evidence in the record supports Plaintiff's claim that J.C. had a history of making false complaints against other MMTP employees. In fact, J.C.'s June 4, 2006 letter states, "I have never had a problem with anybody at the program. You can check my records and ascertain that this is true. All my counselors have been extremely nice and understanding." (Sanders Decl., Ex. 9.) Accordingly, the

---

[6] At the Step III hearing, the Union representatives did not seem to argue, as they did before the Chapter Board, that J.C. "should not be believed as he is unreliable." (Ortiz Aff. ¶ 18.) Even if this constituted a tactical error, however, "tactical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach." *Vaughn*, 2010 WL 1930278, at *4 (internal quotation marks omitted).

Court will not address this allegation any further.

The only evidence before the Court that supports Plaintiff's allegation that J.C. complained about Plaintiff in exchange for favors is a December 7, 2006 letter from one of Plaintiff's patients. (Dorn. Decl., Ex. 11.) The patient wrote that he or she has "direct knowledge that J.C. had a problem with Ms. Budansingh even though she was not his counselor." (*Id.*) The patient also wrote that J.C. "had been solicited to lodge more complaints about Ms. Budansingh by staff in exchange for favorable treatment." (*Id.*) This letter, however, was submitted on Plaintiff's behalf at the Step III hearing (Ortiz Aff. ¶ 16), so the hearing officer had the opportunity to consider it when deciding to uphold Plaintiff's termination. Given the ample testimony supporting J.C.'s veracity and Plaintiff's extensive history of misbehavior, the hearing officer cannot be described as unreasonable for finding this letter not to be persuasive enough to rule for Plaintiff.

With respect to Plaintiff's claim that J.C's allegations were unsupported, uncorroborated, and untrue, the record shows that Mosley, Walker, Jackson, and Vanderkloot all met with J.C. to investigate his complaint. (Sanders Decl., Exs. 11-14.) All of them believed J.C.'s version of events and signed written statements attesting to that fact. (*Id.*) Plaintiff, furthermore, admitted that she has no evidence that anyone coerced these employees into preparing these statements or believing J.C. (McEvoy Decl., Ex. 2 at 324-34.) Additionally, Jackson and Vanderkloot's testimony at the Step III hearing "was consistent with documents presented supporting patient J.C.'s allegations that Budansingh breached his patient confidentiality and made threatening and coercive statements toward J.C."[7] (Ortiz Aff. ¶ 14.) All of this testimony stands in stark contrast to the fact that not one of Plaintiff's co-workers testified on her behalf at the Step III hearing. (*Id.* ¶ 16.)

Plaintiff, however, told the Union that J.C. "did not, himself set forth his allegations in writing." (Compl. ¶ 29.) Although J.C. submitted the June 4, 2006 letter (Sanders Decl., Ex. 9), he never made a second written statement. J.C. told Jackson that he would submit a written statement (*id.* Ex. 13), but then never did (Jackson Aff. ¶ 19). Subsequently, the MMTP's Associate Director of Operations, Glorice Sanders, instructed Jackson "to refrain from making any further attempts to obtain a written statement from J.C., to avoid any possibility that J.C. might feel intimidated or coerced." (Sanders Decl. ¶ 21.) Given that J.C. feared retaliation based on his prior written statement and had been "agitated and visibly upset" when speaking to Mosely about his fears, Sanders's decision not to ask J.C. to make a second, written statement was reasonable.[8] (*Id.* Ex.

---

[7] At the Step III hearing, the Hospital presented at least the following documents: the June 4, 2006 letter from J.C. (Sanders Decl., Ex. 9); the April 25, 2006 memorandum from Plaintiff's co-workers (*id.* at Ex. 7); and the statements from Vanderkloot, Walker, and Jackson regarding their conversations with J.C. (*id.* Exs. 12-14). (Ortiz Aff. ¶ 15.)

[8] Additionally, the administrators could have reasonably had the same concerns with respect to soliciting J.C.'s testimony at the Step III hearing. Although the CBA does not specifically address a patient's failure to testify at a Step III hearing, it does provide that "[i]f the discharge of an [e]mployee results from conduct relating to a patient and the patient does not appear at the arbitration, the arbitrator shall not consider the failure of the patient to appear as prejudicial." (Sanders Decl., Ex. 3 at Article XXIX, § 3.) At the very least, this provision supports the inference that the Union did not breach its duty of fair representation by deciding Plaintiff's grievance in favor of the Hospital without J.C.'s testimony.

11.) Moreover, even if Plaintiff's Union representatives should have demanded — to the extent it was possible for them to do so — a second written statement from J.C., mere negligence on the Union's part does not give rise to a breach of the duty of fair representation. *Vaughn*, 2010 WL 1930278, at *4.

Furthermore, the Court notes that Plaintiff was terminated because her "continued unethical and unprofessional behavior" could no longer be tolerated. (Jackson Aff., Ex. 13.) The incident with J.C. resulted in Plaintiff's termination, but there was a long, documented history of Plaintiff's unprofessional conduct while a Union member. Although Plaintiff claims that her employment history is tainted because of the Union's failure to represent her adequately in the past (Compl. ¶ 32), absolutely no evidence before the Court supports such a claim.

In any event, even setting aside the long history of Plaintiff's professional misconduct, the incident with J.C. alone provided a reasonable basis for the Union to uphold Plaintiff's termination. Especially given the large amount of discretion afforded to a union's decisions during the grievance process, no jury could find that the record supports Plaintiff's claim that the Union breached its duty of fair representation by upholding Plaintiff's termination.

### c. The Decision Not To Proceed to Arbitration

Plaintiff alleges that the Union breached its duty of fair representation "by not demanding that [her discharge] be heard by an impartial arbitrator, as provided for in the CBA." (Compl. ¶ 44.) The CBA, however, does not provide that every grievance will be referred to arbitration. In fact, it provides that, after a Step III hearing and the issuance of a written decision, the Union or the Hospital "may" refer the case to arbitration. (Sanders Decl., Ex. 3 at 93.) The Supreme Court, likewise, has explained that a union's duty of fair representation does not necessitate that every employee's grievance must proceed through arbitration:

> If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined . . . [and] a significantly greater number of grievances would proceed to arbitration. This would greatly increase the cost of the grievance machinery and could so overburden the arbitration process as to prevent it from functioning successfully.

*Vaca*, 386 U.S. at 191-92.

Given the facts in this action, Plaintiff's grievance is one that would only clog the arbitration process. The Union has over 250,000 members, and "thousands of grievances are filed by employees every year." (Babb Aff. ¶ 4.) The Union decided not to process Plaintiff's grievance through arbitration because of "a number of factors," including "her prior disciplinary record and other documented evidence of her inappropriate and improper behavior with patients and employees." (*Id.* ¶ 6.) The Union also realized that, although Plaintiff denied that the incident with J.C. took place as he described it, "a number of witnesses had spoken to [J.C.] and had confirmed what he said in his own statement." (*Id.*) Accordingly, "an arbitrator would be highly unlikely to credit [Plaintiff's] testimony over theirs." (*Id.*) Additionally, the Union "could not count on obtaining favorable

testimony" from any of Plaintiff's co-workers. (*Id.* ¶ 7.) Finally, the Union realized that "the Hospital . . . would have been able to convince an arbitrator that Ms. Budansingh was guilty of a most serious breach of patient confidentiality and patient intimidation and coercion, which were alone a sufficient reason for her termination." (*Id.* ¶ 8.) These rationales for not proceeding to arbitration cannot possibly be described as anything but reasonable.

\*\*\*

For the foregoing reasons, there is no genuine issue of material fact as to whether the Union's behavior was "so far outside a wide range of reasonableness, as to be irrational." *Air Line Pilots*, 499 U.S. at 67 (citations and internal quotation marks omitted). Accordingly, the Court concludes, as a matter of law, that the Union did not act in an arbitrary manner.

2. Discriminatory Manner

"A union's acts are discriminatory when 'substantial evidence' indicates that [the union] engaged in discrimination that was 'intentional, severe, and unrelated to legitimate union objectives.'" *Vaughn*, 2010 WL 1930278, at \*4 (quoting *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Empl. of Am. v. Lockridge*, 403 U.S. 274, 301 (1971)).

Plaintiff alleges that the Union acted in a discriminatory manner but does not make the allegation with any specificity. (Compl. ¶ 43.) The record, furthermore, presents no evidence — let alone "substantial evidence" — supporting such an allegation. Accordingly, the Court concludes that the Union did not act in a discriminatory manner.

3. Bad Faith

"Bad faith, which encompasses fraud, dishonesty, and other intentionally misleading conduct, requires proof that the union acted with an improper intent, purpose, or motive." *Vaughn*, 2010 WL 1930278, at \*4 (internal quotation marks omitted).

Plaintiff alleges that the Union acted in bad faith but does not describe actions taken in bad faith with any specificity. (Compl. ¶ 43.) Perhaps Plaintiff's allegation of bad faith relates to her claim that the Union representatives treated her with hostility and only represented her perfunctorily. (*Id.* ¶ 34.) If so, as discussed above, there is no evidence before the Court supporting those assertions and ample evidence contradicting them. Additionally, the Court detects no other evidence of bad faith in the record before it.

Moreover, even if the Union representatives had made "errors of judgment" during the course of representing Plaintiff, no errors could possibly be construed as "so egregious as to be evidence of bad faith" or a failure to fairly represent Plaintiff. *Barr v. United Parcel Serv.*, 868 F.2d 36, 43 (2d Cir. 1989). Accordingly, the Court concludes that the Union did not act in bad faith.

\*\*\*

Because the Union did not act in a manner that was arbitrary, discriminatory, or in bad faith, the Court need not reach the issues of (1) whether Plaintiff can establish a causal connection between the Union's actions and her alleged injury, or (2) whether the Hospital breached the CBA. *White*, 237 F.3d at 183 nn. 12-13.

## IV. CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment. The Clerk of the Court is directed to terminate the motion located at Doc. No. 60 and close this case.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/20/10

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: July 19, 2010
       New York, New York